IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT KNOXVILLE
May 20, 2026 Session

## SHANNON LEIGH SMITH v. STATE OF TENNESSEE

**Appeal from the Criminal Court for Union County**
No. 5347    Ryan M. Spitzer, Judge
_____

**No. E2025-00858-CCA-R3-PC**
_____

Petitioner, Shannon Leigh Smith, appeals the denial of her post-conviction petition arguing that the post-conviction court erred in denying her claim that trial counsel was ineffective in 1) failing to uncover evidence of a detective's sexual relationship with a State's witness and the same detective's termination from the Tennessee Alcoholic Beverage Commission for misconduct; 2) failing to file a motion to suppress searches of Petitioner's cell phone and Facebook account; 3) inadequately cross-examining the victim's sister-in-law; 4) failing to put forth evidence to support self-defense; 5) failing to call defense witnesses including an expert on battered woman syndrome; 6) and withdrawing motions to disqualify the clerk's office and the district attorney general's office. She further argues that she is entitled to relief based on the cumulative effect of trial counsel's alleged errors. Following our review of the entire record, the briefs and oral arguments of the parties, and the applicable law, we affirm the judgment of the post-conviction court.

### Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed

JILL BARTEE AYERS, J., delivered the opinion of the court, in which ROBERT W. WEDEMEYER, P.J., and MATTHEW J. WILSON, J., joined.

T. Scott Jones[1], Baylee M. Brown, and Jordan D. Davis, Knoxville, Tennessee, for the appellant, Shannon Leigh Smith.

Jonathan Skrmetti, Attorney General and Reporter; Katherine C. Redding, Senior Assistant Attorney General; Jared Effler, District Attorney General; and Rondeau T. Laffitte, Assistant District Attorney General, for the appellee, State of Tennessee.

_____
[1] T. Scott Jones is also listed as Petitioner's attorney on direct appeal. The post-conviction petition attached a waiver of conflict signed by Petitioner. *See Frazier v. State*, 303 S.W.3d 674 (Tenn. 2010).

# OPINION

## Factual and Procedural Background

*Trial*

The case arose from the fatal shooting of Timothy Smith by Petitioner, who was the victim's wife, on July 23, 2017. Petitioner was indicted for second degree murder.[2] *See State v. Smith*, No. E2021-00821-CCA-R3-CD, 2023 WL 405372 (Tenn. Crim. App. Jan. 26, 2023), *perm. app. denied* (Tenn. June 13, 2023). At the time of the shooting, Petitioner and the victim lived in a camper on the property on which they were building a house. *Id.* at *1. Petitioner and the victim were experiencing significant marital strain in the year preceding the shooting. *Id.* The victim's coworkers and acquaintances testified that Petitioner believed the victim was having an affair. *Id.* Two witnesses described their separate experiences in which Petitioner repeatedly and baselessly accused them of having an affair with the victim. *Id.*

Digital evidence recovered from Petitioner's phone reflected this suspicion. Petitioner had written several lengthy notes expressing distress over the victim's perceived infidelity, was tracking the victim's location using the "Find My iPhone" feature, and had searched the victim's Facebook page 127 times. *Id.* at *3. Petitioner also searched and took multiple screenshots of the Facebook page of one of the two women Petitioner alleged was having an affair with the victim. *Id.* The day before the shooting, Petitioner posted twenty-five social-media memes in thirty-five minutes concerning cheating, heartbreak, lying, and betrayal. *Id.*

Petitioner recorded the events leading up to and including the shooting on her cell phone. *Id.* The roughly hour-long recording captured an escalating argument during which the victim repeatedly instructed Petitioner to stop touching him and to move out of the way, while Petitioner persistently questioned why he was angry. *Id.* Petitioner then cried out in pain amid a crashing sound, followed by the victim's statements, "Now get off of me" and "I hope you die." *Id.* Petitioner was then described as "whimpering," followed by a brief silence marked by the sound of a door opening or closing, and then a single gunshot. *Id.* Petitioner's breathing was characterized as distressed as she called 911 to report that she had shot the victim because he had hit her and knocked her down. *Id.* She later told one of the responding officers that she and the victim had gotten into a

---

[2] The post-conviction court took judicial notice of the trial records, and this court does the same of the records on direct appeal. *State v. Lawson*, 291 S.W.3d 864, 869-70 (Tenn. 2009) (holding that an appellate court may take judicial notice of an earlier proceeding in the same case).

fight, that the victim grabbed her when she tried to leave, and that the gun suddenly discharged when she turned around. *Id.*

Responding officers observed injuries to Petitioner and found the victim dead on the ground near the driver side of a pickup truck. *Id.* Petitioner had a bruise under her eyes and was bleeding from a cut above her right eye. *Id.* The victim was holding keys to the truck in his right hand and a cell phone charger in his left hand. *Id.* The truck held trash bags filled with the victim's clothing and medication. *Id.* An autopsy showed the victim died from "a single gunshot wound to the right side of his face." *Id.* He had been shot from an "intermediate range of fire[,] which is between one foot to two to three feet." *Id.* A firearms expert testified that the Glock pistol Petitioner used to shoot the victim was functioning normally and would not fire if dropped. *Id.* at *4.

Randy Summers was the on-call detective in the Union County Sheriff's Office ("UCSO") and the lead detective at the scene. By the time he arrived, deputies had already secured the scene and moved the firearm away from Petitioner for officer safety. Before she was transported for medical treatment, Petitioner signed a waiver and consent to search the truck and the camper. Photographs were taken of her hands and her injuries, and Detective Summers photographed the truck, the camper, and the victim's injuries; he also collected blood evidence and the victim's personal effects. Blood found inside and outside the camper and in the truck was determined to belong solely to Petitioner. *Id.* at *3. Detective Summers waited for Special Agent Nick Brown of the Tennessee Bureau of Investigation ("TBI") to arrive before further processing the scene.

Special Agent Brown received a briefing from Detective Summers and Sheriff William Breeding,[3] and then conducted a systematic walk-through of the scene with Detective Summers, photographing and documenting the scene and collecting blood samples from the truck and the camper, the victim's personal items, the victim's and Petitioner's cell phones, Petitioner's gun, and a spent shell casing. Petitioner was not at the scene when Special Agent Brown arrived. He encountered her later at the UCSO where he photographed her injuries and received her clothing as evidence. All communication with Petitioner was through counsel. Special Agent Brown conducted and supervised forensic extractions on Petitioner's and the victim's phones and recovered and authenticated the hour-long recorded argument between Petitioner and the victim. The recording captured the events leading up to and including the shooting and was played at trial.

---

[3] The summary of the testimonies of Special Agent Brown, Kim Cook, and Amanda Atchley were gleaned from the trial transcript.

Kim Cook, the victim's sister-in-law, testified that at the victim's graveside funeral on July 28, 2017, Petitioner told her, "I wasn't going to let him leave again." She also testified that Petitioner admitted she "shot him" and "killed him." Ms. Cook waited fourteen months before reporting the statement to law enforcement or the prosecutor. She said she did not immediately reveal Petitioner's statement because she was in shock and unsure of what to do. She was interviewed by Special Agent Brown shortly after the funeral but did not tell him what Petitioner had said at the funeral. She disclosed the statement only after she had filed a complaint about the prosecutor's handling of the case. When she was interviewed again by Special Agent Brown in September 2018, she revealed Petitioner's statement. Ms. Cook denied that she discussed Petitioner's statement with her daughter, Amanda Atchley.

Ms. Atchley testified that during the victim's funeral visitation, Petitioner told her she "wasn't going to let him leave again." Like her mother, Ms. Atchley waited fourteen months before telling law enforcement. She waited because of fear, uncertainty, and shock. Ms. Atchley testified that she was unaware Petitioner said the same thing to her mother. Ms. Atchley denied talking to her mother about Petitioner's statement before reporting it to law enforcement. Both gave their statements independently on the same day to Special Agent Brown.

Based on the evidence presented at trial, the jury convicted Petitioner of second degree murder as charged, and the court sentenced her to seventeen years' incarceration. At the close of sentencing, trial counsel informed the trial court that Petitioner had retained new counsel to represent her moving forward.

*Motion for New Trial*

Petitioner filed a motion for new trial asserting a variety of issues. *Smith*, 2023 WL 405372, at *4. In a second amended motion for new trial, Petitioner alleged for the first time that the State failed to disclose evidence of a sexual relationship between Detective Summers and Ms. Atchley. *Id.* In support of the motion, Petitioner submitted affidavits from the victim's two daughters stating Ms. Atchley had told them about the affair, as well as an affidavit from trial counsel confirming the State had not disclosed this information. *Id.* Petitioner filed two additional amended motions for new trial. *Id.* Attached to one of the motions was a copy of a letter dated January 30, 2015, from the Tennessee Alcoholic Beverage Commission ("TABC") terminating Detective Summers. *Id.* In the termination letter, the TABC director stated that Detective Summers' conduct and lack of candor during an investigation of his conduct had "caused [his] credibility to be in question[,] and as such, [his] credibility if called to testify in a criminal case is hampered[,] if not destroyed." *Id.* The investigation stemmed from Detective Summers allegedly smoking marijuana with an informant or observing her smoke marijuana. *Id.*

The letter also accused Detective Summers of engaging in a sexual relationship with the informant which he had not disclosed during the TABC investigation. *Id.*

At the hearing on the motion for new trial, Detective Summers testified, consistent with his trial testimony that he arrived at the scene between 6:00 and 7:00 a.m. *Id.* at *4. Other officers had already secured the scene, including the gun. *Id.* He processed the scene with Special Agent Brown who arrived after him. Detective Summers took all the crime scene photographs, collected the gun, a spent shell casing, and Petitioner's and the victim's cell phones, and took swabs of blood droplets. *Id.*

Detective Summers testified that he had worked for the TABC and his employment was terminated on January 30, 2015, for the reasons set out in the termination letter. *Id.* at *4. At the motion for new trial hearing, Detective Summers maintained that the reasons for his termination and the language of the termination letter were "false." *Id.* Detective Summers testified that when he rejoined the UCSO in 2017, he informed the UCSO Sheriff William Breeding and prosecutors in general about his termination from the TABC but did not provide the letter. *Id.* [4]

Detective Summers met Ms. Atchley in late spring or summer 2018 while visiting his friend, fellow UCSO Detective Eddie Simpson. *Id.* He denied any sexual relationship with Ms. Atchley but acknowledged socializing with her. *Id.* at *5. He also acknowledged using Detective Simpson's phone to contact Ms. Atchley. *Id.* He denied that he discussed the case with Ms. Atchley although she asked him about the case. *Id.* He served her with the subpoena to appear at Petitioner's trial. *Id.* He did not disclose to prosecutors that he had socialized with Ms. Atchley. *Id.*

Detective Summers testified that he was interviewed by TBI Special Agent Michael O'Keefe after the district attorney general initiated an inquiry into his relationship with Ms. Atchley. *Id.* at *5-6. Detective Summers acknowledged he did not initially tell Agent O'Keefe he knew Ms. Atchley would be a trial witness, that he had served her with the subpoena, or that he had spoken with her by phone. *Id.* at *5. He only became forthcoming about these details after he read the transcripts of Agent O'Keefe's interviews of Detective Simpson and Ms. Atchley. *Id.* He agreed he told Agent O'Keefe he could not recall whether he had given an opinion about the case because he was "caught off guard" by the situation. *Id.*

---

[4] The State agreed that had it received a copy of the termination letter, it would have turned it over to the defense "without hesitation." *Id.* at *7.

- 5 -

At the motion for new trial hearing, Ms. Atchley refused to answer any questions about whether she had a sexual relationship with Detective Summers, but she said she was truthful when interviewed by Agent O'Keefe. *Id.* at *6. In a recorded TBI interview admitted into evidence, Ms. Atchley said she had sex with Detective Summers "a couple of times" over two days and that she asked him repeatedly about Petitioner's case, though he refused to discuss it with her. *Id.* She met Detective Summers the summer of 2018 and spent time with him and Detective Simpson during the period between the victim's death and Petitioner's trial. *Id.* Detective Summers was "adamant" that they not talk about the case and said he could not and would not say anything about the case. *Id.* At the hearing, she denied talking to Detective Summers about the case but was aware Detective Summers was the lead investigator. *Id.*

Agent O'Keefe testified that he interviewed Detective Summers, Detective Simpson, and Ms. Atchley as part of the investigation concerning Detective Summers' relationship with Ms. Atchley. *Id.* Ms. Atchley was interviewed first and admitted to having had a sexual relationship with Detective Summers. *Id.* at *6. Detective Summers denied their relationship was sexual, but Agent O'Keefe believed Detective Summers was not being truthful. *Id.* Phone records showed extensive communication between Ms. Atchley and Detective Simpson, and some contact with Detective Summers. *Id.* Detective Simpson's then estranged wife signed an affidavit stating that while reviewing Detective Simpson's text message history on their joint cell phone bill, she saw the text messages between him and Ms. Atchley. He denied that he was having an affair with Ms. Atchley and told her Detective Summers was using his phone to communicate with Ms. Atchley. Agent O'Keefe obtained Detective Summers' termination letter from TABC and included it in his report to the district attorney general. *Id.*

Trial counsel testified he was unaware before trial of the romantic relationship between Detective Summers and Ms. Atchley. *Id.* at *7. Both witnesses were central to the State's case: Detective Summers as the primary investigator who introduced most exhibits, and Ms. Atchley as a source of Petitioner's alleged incriminating statement used to establish intent. *Id.* Trial counsel explained that knowledge of their relationship, as well as post-trial revelations that TABC deemed Detective Summers not credible and had terminated him for dishonesty, would have provided significant impeachment material. *Id.* He testified he would have cross-examined both witnesses on these issues, pursued TABC records, and argued that Ms. Atchley fabricated the statement after beginning her relationship with Detective Summers. *Id.* at *8. He further noted that this information could have affected whether Petitioner testified. *Id.* Trial counsel believed that impeaching both witnesses could have altered the jury's verdict on intent. *Id.*

Sheriff Breeding testified he was unaware of the termination letter and acknowledged that credibility issues with an officer would be cause for concern. *Id.*

Special Agent Brown testified that Detective Summers' conduct did not affect the integrity of the crime-scene processing and that Detective Summers did not handle the digital evidence that was important to the State's theory. *Id.*

The trial court found that the State withheld favorable impeachment evidence but concluded it was immaterial. *Id.* The court reasoned that neither Detective Summers nor Ms. Atchley exchanged case-related information, that the relationship occurred one year after the homicide, and that the State's case rested primarily on the audio recording and digital evidence rather than their testimony. *Id.* The court found that the withheld information would have had "minimal impact on the outcome of the case." *Id.*

*Direct Appeal*

On direct appeal, Petitioner's sole issue was the *Brady* violation related to Detective Summers' TABC termination letter and his relationship with Ms. Atchley. This court held that the undisclosed relationship between Detective Summers and Ms. Atchley, as well as the TABC termination letter, were not material and did not undermine confidence in the verdict. *Id.* at *9-11. The court emphasized that Ms. Atchley's account of Petitioner's incriminating funeral statement was independently corroborated by Ms. Cook, and there was no evidence of collusion; their delayed reporting did not suggest a conspiracy. *Id.* at *10. This court further concluded that cross-examining either witness about a relationship that began a year after the victim's death would not have affected Ms. Cook's separate testimony or the verdict, nor could the relationship have influenced Detective Summers' crime-scene work. *Id.*

Petitioner's claims related to Detective Summers' TABC termination were also rejected on the grounds that the termination involved unrelated misconduct years before the offense and had no bearing on the investigation. *Id.* Other officers observed Detective Summers' evidence collection, and Special Agent Brown confirmed the crime scene was processed appropriately. *Id.* The court further noted that the State only briefly mentioned Petitioner's funeral statement and relied on independent evidence developed by Special Agent Brown such as audio recordings, digital data, and social media activity. *Id.* Even substantial impeachment would not have altered the outcome. The court noted some evidence Detective Summers collected actually supported aspects of Petitioner's self-defense claim. *Id.*

Petitioner filed an application for permission to appeal to the Supreme Court which was denied on June 13, 2023.

- 7 -

*Post Conviction Proceedings*

Petitioner filed a timely petition for post-conviction relief in which she reframed the *Brady* issue as part of her ineffective assistance of counsel claim. Specifically, she alleged that trial counsel should have discovered information about Detective Summers' relationship with Ms. Atchley and his termination from the TABC prior to trial. Petitioner also asserted that trial counsel was ineffective in failing to file motions to suppress the search of her cell phone and Facebook account, in failing to conduct a "robust" cross-examination of Ms. Cook, in failing to offer evidence to support her self-defense theory, and in withdrawing motions seeking to disqualify the clerk's office and the district attorney general's office.

At the evidentiary hearing, Sheriff Breeding testified he had previously worked with Detective Summers and considered him to be a good officer. In 2015, Detective Summers approached him about returning to the UCSO and disclosed "there was an issue with [T]ABC and he was let go[.]" Detective Summers told Sheriff Breeding that he had passed a polygraph examination regarding the allegations, and another UCSO officer "basically confirmed" that account.

Sheriff Breeding explained that he had not reviewed the full TABC file when Detective Summers returned to the UCSO. He later learned – during the hearing on the motion for new trial – that the TABC had issued a January 30, 2015 termination letter stating that Detective Summers had engaged in conduct damaging to the agency's reputation and had provided incomplete and untruthful information during the investigation, undermining his credibility as a witness. The letter revealed that an investigation was initiated into Detective Summers' involvement with an informant. The letter detailed the incident in which the informant used marijuana in front of Detective Summers, as well as a sexual encounter between another agent and the informant that occurred while Detective Summers was present. Sheriff Breeding confirmed the letter was not in Detective Summers' UCSO personnel file in 2017 and would not have been produced had trial counsel requested the file before trial.

Sheriff Breeding also acknowledged that Detective Summers' UCSO personnel file did contain a November 7, 2024 letter from District Attorney General Jared Effler advising that the District Attorney's Office would no longer prosecute cases requiring testimony from Detective Summers. Sheriff Breeding read the letter into the record and noted that this decision occurred after Petitioner's conviction.

Regarding the investigation in this case, Sheriff Breeding confirmed he was present while Detective Summers processed the crime scene. He testified, consistent

with his trial testimony, that Special Agent Brown worked closely with Detective Summers in photographing the scene and collecting evidence.

Sheriff Breeding also testified that at the time of the post-conviction hearing, Detective Summers was still employed by the UCSO, serving in an administrative capacity at the same rate of pay, and that his investigative duties had been limited following the letter from the district attorney general.

TBI Agent O'Keefe's testimony was consistent with his testimony at the motion for new trial hearing. Agent O'Keefe was not involved in the investigation of the shooting but was asked by the prosecutor, Jared Effler, to investigate allegations that Detective Summers was "having [sexual] relations with one of the witnesses in the trial." Agent O'Keefe first interviewed Ms. Atchley at the TBI Office in Knoxville. During the interview, Ms. Atchley confirmed she had a sexual relationship with Detective Summers. Based on Ms. Atchley's interview, Agent O'Keefe then interviewed Detective Simpson and Detective Summers. He also subpoenaed Detective Summers' personnel files from the TABC and the UCSO. The TABC file contained the letter from Keith Bell, the Executive Director, terminating Detective Summers following an internal investigation. After Agent O'Keefe obtained the TABC dismissal letter, he questioned Detective Summers about the nature of his relationship with Ms. Atchley. He did not believe Detective Summers when he denied having a sexual relationship with Ms. Atchley. Agent O'Keefe opined that in his professional opinion, he would have serious misgivings about working on a case with Detective Summers.

Consistent with his testimony at trial, Detective Summers testified that he was the on-call investigator the day of the shooting and was the first investigator to arrive at the scene, where he helped secure and photograph the scene and handled early physical evidence, including the collection and packaging of the victim's and Petitioner's cell phones and other items.

Detective Summers acknowledged his termination from TABC, but he minimized the circumstances that led to his termination and maintained that he had done nothing wrong. Detective Summers denied the allegations against him involved "dishonesty and sexual impropriety." When asked whether he had participated in a sexual encounter as described in the TABC letter, Detective Summers declined to respond. He confirmed that trial counsel did not question him about his termination from the TABC or any matters from his UCSO personnel file at trial.

Detective Summers denied he had a sexual relationship with Ms. Atchley. He testified that he had discussed his TABC termination with the district attorney general's office before trial, although he could not recall whether he disclosed the existence of the

TABC Director's formal written findings. Detective Summers said he would not have spoken with trial counsel pre-trial even if he had been approached.

Trial counsel testified that he had decades of experience in criminal practice and that his experience included substantial homicide trial work on both the prosecution and defense sides. He was retained after Petitioner's first trial counsel withdrew from representation. His practice included investigation, witness preparation, cross-examination, and the development of trial strategy, including the pursuit of self-defense theories. As a matter of routine practice, he did not subpoena law-enforcement personnel files absent a specific reason to believe they contained relevant impeachment material, nor did he typically inquire into the sexual history of officers or witnesses without a factual basis to do so.

Trial counsel stated he had no knowledge of a sexual relationship between Detective Summers and Ms. Atchley before or during trial; nothing in discovery provided by the State suggested such a relationship. He was unaware of the TABC findings concerning Detective Summers or that the agency had questioned his credibility. The personnel file he received from the UCSO did not contain the TABC letter, and he had no reason to suspect additional undisclosed materials existed. He testified that, had the information been disclosed, he would have used it for impeachment and believed it would have affected the outcome of the trial.

Trial counsel reviewed the search warrants for Petitioner's cell phone and Facebook account; and based on the law at the time, he concluded that a suppression motion would not have succeeded. He acknowledged that later case law changed the legal landscape, but those developments were not foreseeable at the time of trial.

With respect to the cross-examination of Ms. Cook, trial counsel testified that he questioned her consistent with his trial strategy. He did not have impeachment evidence beyond what was presented at trial and believed his cross-examination was appropriate under the circumstances.

Trial counsel testified that he advanced Petitioner's self-defense theory and did not believe expert testimony was necessary to present that; he focused on the physical evidence and eyewitness accounts. Trial counsel did not hire an investigator, did not request a mental health evaluation, and did not consult an expert on battered woman syndrome. He did not believe the evidence would support a battered woman syndrome defense. Additionally, he was concerned that asserting the defense could potentially elevate the charge to first degree murder. His strategy was to pursue self-defense relying heavily on photographic evidence showing Petitioner's injuries. Trial counsel requested, and the trial court gave a self-defense instruction at trial.

- 10 -

Trial counsel acknowledged that Petitioner's first trial counsel filed motions to disqualify the local circuit court clerk's office and the district attorney general's office based on potential conflicts of interest. He withdrew the motions because he believed they lacked legal merit. Regarding a motion to change venue based on concerns about juror bias or the influence of a small community, trial counsel testified that such issues are typically explored and addressed during voir dire, which he conducted in this case and during which he used all of his peremptory strikes. He also acknowledged that he did not interview all civilian witnesses, did not file motions to suppress statements or searches, and presented no defense witnesses at trial.

Petitioner presented testimony from two expert witnesses. Anthony Craighead, who testified as an expert in criminal prosecution, was a former career prosecutor with more than three decades of experience in homicide and major felony litigation. Robert Willis White, Sr., testified as an expert in criminal defense, drawing on his extensive experience in homicide defense work. Both witnesses recounted their lengthy careers handling criminal cases and described "good practices" governing pretrial investigation, motions practice, attorney preparation, impeachment of law-enforcement witnesses, and the development of trial strategy in homicide litigation. Mr. Craighead explained that homicide cases require substantially heightened preparation because "[t]he consequences of losing a murder case are vastly different than the consequences of losing a DUI or shoplifting case[.]"

While Mr. Craighead acknowledged he did not frequently observe requests to subpoena officer personnel files, he testified that he had seen subpoenas in cases "of this level, of this consequence," where credibility concerns are central. Both experts agreed that any indication of a personal relationship between a lead investigator and a key witness, as well as evidence of prior disciplinary action – such as the matters referenced in the TABC letter concerning Detective Summers – would constitute significant impeachment material that diligent counsel would pursue. Mr. White emphasized that credibility was central to this case, and that information concerning Detective Summers and his relationship with Ms. Atchley and his prior termination from the TABC were key to meaningfully testing his credibility. They stressed the importance of cross-examination but acknowledged that effective cross-examination is shaped by the impeachment evidence available to counsel.

Regarding trial strategy, both experts agreed that if counsel had access to proof such as photographs to support a defense, they would expect that proof to be used. Mr. White added that evidence bearing on the defendant's perceptions and the circumstances of the confrontation should be exhibited. In cases involving domestic violence dynamics, they noted that counsel often considers consulting an expert on battered woman syndrome to assist the jury in understanding the defendant's perceptions and reactions.

- 11 -

Both experts were concerned by the lack of pretrial motions filed by trial counsel. They testified that reviewing digital search warrants is standard practice in homicide cases and that suppression motions are commonly filed. Mr. Craighead said he would have expected a search warrant for a defendant's phone to be challenged in a suppression motion. Mr. White testified that the search warrant for Petitioner's phone was "overly broad" and that it would have constituted "good practice" for a suppression motion to have been filed just on that factor alone.

Each expert also expressed concern that motions to disqualify the clerk's office and the district attorney general's office were withdrawn. Mr. Craighead stated in his experience, in a situation where a defendant previously worked in the clerk's office in a small county, he would have expected a motion to be filed so that any potential conflict could be addressed on the record in open court. Mr. White agreed that given Petitioner's prior employment in the clerk's office, he would have litigated a motion to disqualify that office. When informed that the public defender's office had initially recused itself from Petitioner's case, Mr. White testified that this development strengthened the rationale for pursuing the motion to disqualify the district attorney general's office as well. Both experts noted that withdrawing these motions limited Petitioner's ability to challenge potential conflicts or institutional bias and to ensure a fair trial.

The parties also stipulated that Stephen Ross Johnson, an attorney with Ritchie, Johnson and Stovall and the Innocence Project, was an expert in criminal defense. While he was unable to testify at the hearing, Mr. Johnson would have testified that he would expect a substantial number of pretrial motions to be filed in a homicide case to test the sufficiency of the evidence; he would also expect the use of an investigator. He would have offered testimony similar to Mr. White's regarding the two motions to disqualify the clerk's office and the district attorney general's office.

The post-conviction court entered a written order denying post-conviction relief concerning each claim raised by Petitioner. The post-conviction court ultimately credited trial counsel's testimony as a matter of strategy and found that Petitioner failed to prove ineffective assistance of counsel by failing to prove either deficient performance or prejudice. It is from this judgment that Petitioner now appeals.

**Analysis**

Petitioner contends the post-conviction court erred in finding she did not receive ineffective assistance of trial counsel. More specifically, Petitioner argues that trial counsel was ineffective for failing to uncover evidence of Detective Summers' sexual relationship with Ms. Atchley and Detective Summers' termination from the TABC; for failing to file a motion to suppress the search of Petitioner's cell phone and Facebook

account; for inadequately cross-examining Ms. Cook; for failing to put forth evidence or call witnesses to support the self-defense claim; for failing to call defense witnesses including an expert witness on battered woman syndrome; and for withdrawing motions to disqualify the clerk's office and the district attorney general's office. She further argues that the cumulative effect of trial counsel's error entitles her to relief.

## I. Ineffective Assistance of Counsel

Under the Post-Conviction Procedure Act, a criminal defendant may seek relief from a conviction or sentence that is "void or voidable because of the abridgment of any right guaranteed by the Constitution of Tennessee or the Constitution of the United States." T.C.A. § 40-30-103. The right to effective assistance of counsel is safeguarded by the Constitutions of both the United States and the State of Tennessee. U.S. Const. amend. VI; Tenn. Const. art. I, § 9. As such, "[t]he deprivation of effective assistance of counsel is a constitutional claim cognizable under the Post-Conviction Procedure Act." *Howard v. State*, 604 S.W.3d 53, 57 (Tenn. 2020) (quoting *Moore v. State*, 485 S.W.3d 411, 418 (Tenn. 2016)).

When a claim of ineffective assistance of counsel is made, the burden is on the petitioner to show (1) that counsel's performance was deficient and (2) that the deficiency was prejudicial. *Strickland v. Washington*, 466 U.S. 668, 687 (1984); *see Lockhart v. Fretwell*, 506 U.S. 364, 368-72 (1993); *Kendrick v. State*, 454 S.W.3d 450, 457 (Tenn. 2015). Deficient performance is representation that falls below "an objective standard of reasonableness" as measured by prevailing professional norms, and courts begin with "the strong presumption" that counsel exercised professional reasonable judgment. *Kendrick*, 454 S.W.3d at 457-58 (quoting *Strickland*, 466 U.S. at 688); *see also Baxter v. Rose*, 523 S.W.2d 930, 932-33 (Tenn. 1975). In assessing deficiency, the Court must evaluate counsel's actions from counsel's perspective at the time and avoid using hindsight to second-guess reasonable tactical decisions, even if another strategy might have produced a different outcome. *Hellard v. State*, 629 S.W.2d 4, 9 (Tenn. 1982); *Adkins v. State*, 911 S.W.2d 334, 347 (Tenn. Crim. App. 1994); *Williams v. State*, 599 S.W.2d 276, 279-80 (Tenn. Crim. App. 1980).

To show prejudice, a petitioner must demonstrate a reasonable probability that, but for counsel's deficient performance, the outcome of the proceeding would have been different. *Strickland*, 466 U.S. at 694; *Kendrick*, 454 S.W.3d at 458. A reasonable probability is "a probability sufficient to undermine confidence in the outcome." *Strickland*, 466 U.S. at 694. Reasonable probability is a lesser burden of proof than preponderance of the evidence. *Kendrick*, 454 S.W.3d at 458 (citing *Williams v. Taylor*, 529 U.S. 405-06 (2000)).

- 13 -

When a petitioner asserts that trial counsel was ineffective for failing to call a witness, the same witness must be called to testify at the post-conviction hearing. *Black v. State*, 794 S.W.2d 752, 757 (Tenn. 1999). A petitioner cannot demonstrate prejudice if an omitted witness is not produced because "neither a trial judge nor an appellate court can speculate or guess on the question of whether further investigation would have revealed a material witness or what a witness's testimony might have been if introduced by defense counsel." *Id.* at 757-58.

Furthermore, when the proof of guilt is overwhelming, proving prejudice is exceedingly difficult. *See Proctor v. State*, 868 S.W.2d 669, 673 (Tenn. Crim. App. 1992); *Bray v. State*, No. M2011-00665-CCA-R3-PC, 2012 WL 1895948, at *6 (Tenn. Crim. App. May 23, 2012) (finding that, in light of overwhelming evidence, petitioner could not demonstrate prejudice); *McNeil v. State*, No. M2010-00671-CCA-R3-PC, 2011 WL 704452, at *6 (Tenn. Crim. App. Mar. 1, 2011) (finding that overwhelming evidence of guilt precluded showing of prejudice from admission of evidence at trial).

Failure to satisfy either prong results in the denial of relief. *Strickland*, 466 U.S. at 697; *Nesbit v. State*, 452 S.W.3d 779, 786-87 (Tenn. 2014). Accordingly, if either factor is not satisfied, there is no need to consider the other factor. *Finch v. State*, 226 S.W.3d 307, 316 (Tenn. 2007) (citing *Carpenter v. State*, 126 S.W.3d 879, 886 (Tenn. 2004)). "[T]he petitioner is required to prove the fact of counsel's alleged error by clear and convincing evidence." *Phillips v. State*, 647 S.W.3d 389, 401 (Tenn. 2022) (quoting *Dellinger v. State*, 279 S.W.3d 282, 294) (Tenn. 2009)); *see also* T.C.A. § 40-30-110(f); Tenn. Sup. Ct. 28, § 8(D)(1).

"Appellate review of an ineffective assistance of counsel claim is a mixed question of law and fact that this Court reviews de novo." *Phillips*, 647 S.W.3d at 400 (citing *Dellinger*, 279 S.W.3d at 294). As an appellate court, we are bound by the factual findings of the post-conviction court unless the evidence in the record preponderates against those findings. *Howard*, 604 S.W.3d at 57 (citing Tenn. R. App. P. 13(d)); *see also Arroyo v. State*, 434 S.W.3d 555, 559 (Tenn. 2014); *Fields v. State*, 40 S.W.3d 450, 456 (Tenn. 2001). The same does not hold true for the post-conviction court's conclusions of law which are reviewed de novo with no presumption of correctness. *Howard*, 604 S.W.3d at 57; *Holland v. State*, 610 S.W.3d 450, 455 (Tenn. 2020).

### Expert Witness Testimony

Petitioner raises as a stand-alone issue the post-conviction court's alleged "error in rejecting the unrebutted testimony of expert witnesses," and because she repeats this assertion throughout her ineffective-assistance claims, we will first address the governing principles before turning to her specific allegations. At oral argument, Petitioner

acknowledged that the burden of proof in post-conviction proceedings rests with a petitioner and that the State is not required to "rebut" testimony or evidence, if at all, unless the petitioner establishes her factual allegations by clear and convincing evidence.

Although expert witnesses may testify concerning prevailing professional norms, the post-conviction court is not required to accept such testimony as dispositive, even when unrebutted. As the trier of fact, the post-conviction court retains discretion to assess credibility and to determine the weight to be afforded to expert witnesses, just like any other witness, and unrebutted proof does not shift a petitioner's burden of persuasion. *Arroyo* 434 S.W.3d at 559; *Fields*, 40 S.W.3d at 456. Here, the experts' assessments primarily reflected hindsight judgments about what counsel "should have done" in light of information that surfaced after trial. Because *Strickland* requires evaluation of counsel's conduct from counsel's perspective at the time and prohibits reliance on hindsight, the post-conviction court acted within its discretion in assigning the experts' testimony limited weight. *Strickland*, 466 U.S. at 689; *Hellard*, 629 S.W.2d at 9. As such, this issue is a challenge to the post-conviction court's credibility determination, and the evidence does not preponderate against it. *Howard*, 604 S.W.3d at 57. Petitioner is not entitled to relief.

### Failure to Investigate Detective Summers –
### Sexual Relationship with Ms. Atchley and Termination from TABC

Petitioner asserts that trial counsel rendered ineffective assistance by failing to uncover both Detective Summers' alleged sexual relationship with Ms. Atchley and his termination from the TABC for misconduct. According to Petitioner, a reasonably diligent or "meaningful" investigation would have uncovered this information, and she faults counsel for not requesting Detective Summers' personnel or disciplinary files, interviewing Detective Summers or other officers, subpoenaing documents, or engaging an investigator. The State argues that counsel's performance must be judged based on what he knew at the time, not in hindsight, and at the time counsel had no reasonable basis to investigate Detective Summers. The State further argues that Detective Summers' role in processing the crime scene was unaffected by the relationship or his termination from the TABC and had no bearing on the overwhelming proof of Petitioner's guilt.

In denying post-conviction relief, the post-conviction found:

Aside from making a general practice of asking all witnesses in all cases if they are, or have been, in intimate relationship or other personal relationships with anyone else involved in the case, which apparently is not common practice in criminal cases, it is hard to imagine how [trial counsel]

- 15 -

might have uncovered the intimate relationship between Detective Summers and Ms. Atchley on his own. No testimony or other proof has been provided by Petitioner of precisely how [trial counsel] should have discovered the brief intimate relationship. No reference has been made to typical discovery motions or other means commonly used by other competent criminal defense attorneys that would have uncovered such a relationship. Perhaps a criminal investigator might have uncovered it. But even a criminal investigator would most likely focus more on the crime itself and would have little reason to inquire about such an unlikely situation.

The evidence does not preponderate against the post-conviction court's findings. The proof shows that trial counsel had no reason to suspect, and no means of discovering, the alleged relationship between Detective Summers and Ms. Atchley prior to trial. The matter surfaced only after the verdict, when Ms. Atchley revealed the relationship to the victim's daughters. At the post-conviction hearing, Detective Summers maintained that no sexual relationship occurred. Because the relationship was not revealed to counsel, arose after the trial, and would not have been disclosed even upon inquiry, trial counsel's performance was not deficient.

The post-conviction court found trial counsel's failure to uncover Detective Summers' termination from TABC a "slightly closer call." The post-conviction court observed that trial counsel could have subpoenaed or otherwise obtained the personnel files of all the involved officers as a matter of thorough practice, and doing so may have revealed a gap in Detective Summers' employment that might have prompted further inquiry and potentially lead to the TABC termination letter. Nevertheless, the court found that trial counsel had no grounds to conduct a full-scale investigation into Detective Summers' employment history:

There does not appear to be anything that should have put [trial counsel] on notice that he needed to look into Detective Summers' background. So, the Petitioner necessarily has to rely upon the assertion that requesting personnel files in a criminal case is a "good practice per Mr. White and more common in high-level cases per Mr. Craighead. While this is almost certainly true, and the Court finds both of these experienced attorneys fully credible on this point, a request or demand for officer personnel files without a specific reason to do so is not, on this record, an actual *requirement* for competent representation. Accordingly, the Court finds that Petitioner has failed to carry her burden to establish that [trial counsel]'s performance fell below the range of competence on this issue.

- 16 -

The post-conviction court credited the testimony of experienced practitioners who described requesting personnel files as "good practice," but determined that trial counsel's decision not to investigate Detective Summers' employment history was not ineffective given the circumstances known at the time. Here, the record contained no red flags that would have alerted a reasonably competent attorney to probe Detective Summers' employment history or personal relationships. Nothing about his role in the investigation, the manner in which he collected and documented the crime scene, or information available to counsel suggested that Detective Summers exhibited credibility issues, disciplinary problems, or any other circumstance that would have prompted further inquiry. Agent Breeding testified that he observed nothing in the processing of the crime scene by Detective Summers to cause him concern. He flatly denied that he observed Detective Summers manipulate or tamper with the evidence. Further, Petitioner raised no issue on direct appeal relating to Detective Summers' investigatory work on the crime scene.

Additionally, the record undermines Petitioner's assertion, as the TABC termination letter would not have been disclosed had counsel sought Detective Summers' personnel file. Sheriff Breeding testified that the TABC letter was not part of Detective Summers' UCSO personnel file and would not have been included in the file in response to any pretrial request. Sheriff Breeding also testified he was unaware of the letter until the hearing on the motion for new trial. This evidence does not preponderate against the post-conviction court's finding that counsel's inability to discover the termination was not the product of deficient investigation, but rather that the information Petitioner now argues counsel should have uncovered was simply not reasonably accessible through the avenues available at the time.

Petitioner argues the post-conviction court improperly evaluated prejudice under the *Brady* materiality standard rather than the *Strickland* standard applicable to ineffective-assistance claims. The post-conviction court rejected both claims concerning the alleged relationship between Detective Summers and Ms. Atchley and the TABC termination, noting that this court had already determined on direct appeal that neither category of evidence was material. *Smith*, 2023 WL 405372, at *10. Because the earlier ruling established there was no reasonable probability that the evidence would have altered the verdict, the court concluded that Petitioner could not show prejudice under *Strickland* and therefore failed both prongs. Although the post-conviction court's explanation was brief, the outcome is grounded in settled principles: *Brady* and *Strickland* each require a showing that the omitted evidence would have affected the trial's result, and a prior finding of immateriality necessarily weakens any attempt to establish prejudice or to satisfy the material-and-favorable requirement under *Black*. *Strickler v. Greene*, 527 U.S. 263, 281 (1999) (defining materiality as "a reasonable probability that the suppressed evidence would have produced a different verdict")

*Strickland*, 466 U.S. at 694 (defining prejudice as a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different").

Indeed, the record confirms that neither the alleged relationship nor the TABC termination could have changed the verdict. Detective Summers processed the scene in the presence of other officers and under the oversight of Special Agent Brown, who observed no mishandling of evidence; the blood evidence and photographs he collected supported, rather than undermined, Petitioner's self-defense theory. *Smith*, 2023 WL 405372, at *8. Likewise, impeachment of Ms. Atchley would have had limited effect because Ms. Cook independently testified to Petitioner's incriminating statement, and there was no evidence of collusion or fabrication. *Id.* at *4, 10. Nothing about the challenged evidence would have altered the physical proof or the conclusions drawn from it. As a result, Petitioner failed to show a reasonable probability of a different outcome, and the post-conviction court properly denied relief.

### Failure to File a Motion to Suppress the Search of Petitioner's Cell Phone and Facebook Account.

Petitioner argues that trial counsel provided ineffective assistance by failing to file a motion to suppress the search of her cell phone and Facebook account, which she claims the State used to depict her as an "irrational and obsessive" spouse driven by jealousy and to undermine her credibility and account of the shooting. She maintains that a suppression motion would have "succeeded in part" because the warrants were overbroad, stale, lacked particularity, and failed to establish a nexus between her devices and evidence of a crime. The State argues that any suppression motion would not have succeeded even if litigated. The State further asserts that this claim is subject to partial waiver because the warrant directed to Facebook is not in the record. Petitioner does not address the State's waiver argument but contends that "unrebutted expert testimony" established that a reasonably competent attorney would have filed a suppression motion and that counsel's failure to do so forfeited the opportunity to challenge the State's most damaging evidence and to raise the issue on direct appeal.

To succeed on an ineffective-assistance claim arising from counsel's failure to seek suppression of evidence under the Fourth Amendment, the Petitioner bears the burden of proving that: "(1) a suppression motion would have been meritorious; (2) counsel's failure to file such motion was objectively unreasonable; and (3) but for counsel's objectively unreasonable omission, there is a reasonable probability that the verdict would have been different absent the excludable evidence." *Phillips*, 647 S.W.3d at 404 (citations omitted).

- 18 -

The search warrant directed to Facebook is not included in the appellate records of the direct appeal or post-conviction. Petitioner's arguments do not distinguish between the two warrants. However, without the Facebook warrant, Petitioner cannot establish what the warrant authorized, whether any alleged defect existed, or whether a reasonably competent attorney should have recognized a viable basis for suppression. *See Vaughn v. State*, 202 S.W.3d 106, 116 (Tenn. 2006) (recognizing that courts cannot find deficiency where the record does not demonstrate that the omitted motion had merit). An appellant bears the duty to prepare an adequate record for review, and when a critical document is absent, this Court must presume the correctness of the post-conviction court's ruling. Tenn. R. App. P. 27; *State v. Ballard*, 855 S.W.2d 557, 560–61 (Tenn. 1993). Because the Facebook warrant is not before us, we presume the post-conviction court did not err in denying relief as to that portion of the claim.

Regarding Petitioner's claim that trial counsel failed to file a motion to suppress the search warrant for her cell phone, the post-conviction court impliedly credited trial counsel's testimony that a suppression motion would not have succeeded because the governing law at the time required far less particularity for digital search warrants than later decisions now demand. Trial counsel testified that although the warrants may have been broad, the law at the time of Petitioner's March 2019 trial had not yet articulated the heightened particularity requirements governing digital searches. *See State v. McLawhorn*, 636 S.W.3d 210, 242 (Tenn. Crim. App. 2021) (noting that Tennessee appellate courts had not yet addressed the level of particularity required for phone search warrants in light of modern devices' expansive data storage and the privacy concerns identified in *Riley v. California*, 573 U.S. 373 (2014)). Emphasizing that trial counsel's performance must be evaluated based on the legal landscape as it existed when the decision was made, the court found that trial counsel "candidly testified that he did not file motions to suppress then but that he might now because the law has changed and now requires officers to be more specific in their search warrant applications." Noting that trial counsel was aware of the evolution of the law in this area, the court also found, "[I]t also reminds the Court that we are to judge trial counsel's decisions in light of the situation at the time rather than substituting our own hindsight. Accordingly, the Court finds that [trial counsel] was not deficient in his decision not to file motions to suppress the cell phone and Facebook searches."

Consistent with established precedent, counsel is not required to anticipate future changes in the law, and performance must be evaluated under the legal framework that existed at the time. *See Nelson v. State*, No. M2022-00375-CCA-R3-PC, 2023 WL 5348789, at *24-26 (Tenn. Crim. App. Aug. 21, 2023) (holding that counsel was not ineffective for failing to move to suppress cell phone location data because, under then-existing law, the defendant lacked a reasonable expectation of privacy in such records and Fourth Amendment doctrine was too unsettled to render counsel's omission

deficient), *perm. app. denied* (Tenn. Feb. 12, 2024); *French v. State*, 2021 WL 1100765, at *14 (Tenn. Crim. App. Mar. 23, 2021) (holding that counsel was not ineffective for failing to seek suppression of cell phone location data because, at the time of trial, the law did not clearly recognize a privacy interest in such data and a suppression motion was unlikely to succeed); *Howell v. State*, No. M2018-02050-CCA-R3-PC, 2019 WL 6954191, at *4, n. 1 (Tenn. Crim. App. Dec. 19, 2019) (rejecting the petitioner's argument that a later-decided controlling case, even if it would have made suppression motion meritorious, could render trial counsel's earlier failure to file such a motion deficient). The record does not preponderate against the post-conviction court's findings. Petitioner is not entitled to relief.

Further, as the post-conviction court noted, had trial counsel filed and succeeded on a motion to suppress the cell phone evidence, the central fact – that Petitioner shot the victim – was never in dispute. Although the cell phone recording captured the shooting, it was cumulative to facts established through other, independent evidence. The State presented evidence establishing the circumstances of the offense, including Petitioner's own 911 call, her inconsistent statements to responding officers, the operability of the firearm, and evidence showing the unarmed victim was preparing to leave when he was shot in the face. *Smith*, 2023 WL 405372, at *1-4. Petitioner's search history and collection of text messages were offered to show Petitioner's motive for shooting the victim and to provide context for the estranged relationship between Petitioner and the victim. The jury heard and saw evidence of the state of the marriage from several fact witnesses including the two women who Petitioner accused of having an affair with the victim. *Id.* at *1. On this record, Petitioner cannot demonstrate that suppression of the digital evidence from her cell phone would have undermined confidence in the verdict.

## Ineffective Cross-Examination of Kim Cook

Petitioner asserts that trial counsel rendered ineffective assistance by failing to conduct a sufficiently probing cross-examination of Ms. Cook regarding her delay in reporting Petitioner's statement from the victim's funeral, "I wasn't going to let him leave again." Petitioner maintains that counsel should have pursued additional lines of inquiry, including why Ms. Cook waited more than fourteen months to disclose the statement, whether grief, anger, or family discussions influenced her memory, whether her daughter's recollection was independent or derived from her own, whether emotional circumstances affected her perception, and whether she had made any prior inconsistent statements. The State responds that Petitioner has not shown that counsel's performance was constitutionally ineffective.

In rejecting this claim, the post-conviction court found:

[The] Court finds that trial defense counsel [][] did, in fact, question Ms. Cook about not reporting [Petitioner]'s alleged statement until "more than 14 months later" and actually asked her several questions about when and to whom she first reported it. Although reasonable minds can differ about what constitutes a "robust" cross-examination, there is no requirement for competent performance that [trial counsel] ask a certain minimum number of questions on the issue or be particularly hostile in cross-examining the witness. In fact, unnecessarily lengthy or aggressive cross-examination might be perceived poorly by members of the jury and ultimately be counterproductive for the defendant. Such issues are left to the sound discretion of trial counsel in the moment and will rarely be second-guessed. And the Court cannot find that [trial counsel's] performance was deficient in this regard. Likewise, since the jury was clearly made aware of the fourteen (14) month delay in reporting, the Petitioner has suffered no prejudice.

The evidence does not preponderate against the post-conviction court's factual findings. The trial transcripts reflect that Ms. Cook did not disclose the alleged funeral-day statement until September 13, 2018, despite having been interviewed by Special Agent Brown in September 2017. When asked at trial why she waited, Ms. Cook explained that she was in shock, afraid, and unsure what to do, and that she ultimately came forward only after expressing dissatisfaction with the prosecution's handling of the victim's case. In light of this record, trial counsel's cross-examination of Ms. Cook was reasonable.

The post-conviction court also found no prejudice, noting that the jury was fully aware of Ms. Cook's delay and heard her explanation for it, as well as Ms. Atchley's testimony regarding the circumstances of their separate statements. And in the post-conviction setting – where the petitioner bears the burden of proving prejudice – Petitioner's failure to call Ms. Cook to establish what her answers to these proposed questions would have been leaves the claim without evidentiary support. Without presenting Ms. Cook as a witness at the post-conviction hearing, Petitioner offered no proof that the additional questions would have elicited testimony favorable to her and would have undermined the State's case. This omission is fatal. Under *Black*, a petitioner who alleges that counsel failed to adequately examine or impeach a witness must present that witness at the post-conviction hearing to demonstrate prejudice. 794 S.W.2d at 757-58; *see also Williams v. State*, No. M2020-00512-CCA-R3-PC, 2022 WL 2282717, at *4 (Tenn. Crim. App. June 23, 2022) (concluding that the petitioner failed to demonstrate prejudice where he did not present the witness at the evidentiary hearing to show what additional testimony more extensive cross-examination would have

produced). Because Petitioner failed to establish deficient performance and prejudice, she is not entitled to relief.

**Failure to Offer Proof in Support of Self-Defense Theory**

Petitioner contends the post-conviction court erred in finding that trial counsel "presented" the self-defense theory, asserting that trial counsel presented "no witnesses, no expert testimony, no medical or forensic evidence, no exploration of domestic-violence dynamics, and no evidentiary support" for her account of the events preceding the shooting. The State responds that trial counsel argued self-defense throughout the trial and that Petitioner cannot show prejudice because she failed to present at the post-conviction hearing, the very evidence she claims trial counsel should have introduced.

The post-conviction court found that trial counsel presented the self-defense theory through both argument and evidence:

> [T]he Court finds that [trial counsel] did, in fact, argue self-defense to the jury on multiple occasions, including but not limited to, during voir dire, during his opening statement, and during the defense closing argument. In addition, the photo of the injury to the Petitioner's head from where she was shoved into the kitchen counter by the victim was admitted into evidence. Accordingly, the Court finds that [trial counsel] did, in fact, argue self-defense adequately within the range of competence for criminal defense attorneys. Furthermore, since the jury was actually made aware of the Petitioner's self-defense argument on several occasions throughout the trial, the Petitioner has suffered no prejudice.

The evidence does not preponderate against the post-conviction court's findings. Here, trial counsel used the State's evidence to advance the theory that Petitioner acted in self-defense. Counsel relied on photographs documenting Petitioner's injuries immediately after the shooting. The audio recording extracted from Petitioner's cell phone captured the critical sequence of events: Petitioner and the victim arguing back and forth; the victim stating, "The next time I see you I want it to be in court"; Petitioner crying out in pain amidst a crashing sound; and the victim saying, "Now get off of me" and "I hope you die." *Smith*, 2023 WL 40537, at *3. In summarizing the recording, Special Agent Brown in effect bolstered the defense theory by confirming that Petitioner could be heard "whimpering" or crying, indicating she had been harmed and was in pain. The fact that counsel did not introduce the evidence independently does not mean it was not effectively used in the defense. Given this evidence and the allocation of the burden of proof, counsel's decision to use the evidence available at trial to establish self-defense was objectively reasonable.

Petitioner's claim also fails under *Black*, which requires a post-conviction petitioner to present the evidence allegedly omitted at trial in order to establish prejudice. 794 S.W.2d at 757-58. Because Petitioner presented no such evidence, and because the jury was repeatedly made aware of her self-defense theory, she cannot demonstrate a reasonable probability of a different outcome. Petitioner is not entitled to relief.

**Failure to Call Defense Witnesses and Battered Woman Syndrome Expert**

Petitioner contends that trial counsel was ineffective for presenting no witnesses, no experts, and "no independent evidence" to support her account of the events. At the post-conviction hearing, however, Petitioner focused primarily on counsel's failure to investigate and present expert testimony on battered woman syndrome or domestic violence. On appeal, she has expanded the claim to encompass a wide range of additional witnesses: a crime-scene reconstructionist to support her theory of an accidental discharge; a medical expert to corroborate that her injuries were consistent with being struck; audio-recording experts to analyze background sounds for indications of physical movement or shoving; and lay witnesses to rebut Ms. Cook's testimony. The State argues that Petitioner is not entitled to relief because she failed to call all the witnesses she complains counsel should have called at trial. The post-conviction court briefly acknowledged that Petitioner's claim could be read more broadly, but it confined its analysis to the absence of a battered woman syndrome expert, reflecting the emphasis Petitioner placed on that theory below.

Enlarging an issue on appeal beyond the theory advanced in the trial court ordinarily results in waiver; thus, Petitioner's broader complaint about additional witnesses is waived. *State v. Britton*, 710 S.W.3d 177, 203 (Tenn. Crim. App. 2025); *State v. Dobbins*, 754 S.W.2d 637, 641 (Tenn. Crim. App. 1988). Waiver notwithstanding, she is not entitled to relief. Despite asserting that counsel should have presented "multiple categories of readily available defense witnesses," Petitioner did not call any such witnesses at the post-conviction hearing, nor did she offer expert testimony or other proof establishing what these witnesses would have said. *Black*, 794 S.W.2d at 757-58. Because Petitioner failed to present the witnesses she claims counsel should have introduced, she cannot establish prejudice and therefore cannot demonstrate ineffective assistance of counsel. *Strickland*, 466 U.S. at 697; *Nesbit*, 452 S.W.3d at 786-87.

As to the specific allegation regarding the failure to pursue and offer proof of battered woman syndrome as a defense theory, the post-conviction court found that trial counsel made a strategic decision not to pursue that theory: "[T]he Court finds that [trial counsel] articulated his own strategic reason for not pursuing a Battered Woman

Syndrome defense – specifically that he felt it could potentially help the State prove the higher offense of First Degree Murder (requiring premeditation)." The court noted that it was clear trial counsel had "given considerable thought to the potential pitfalls of raising a Battered Woman Syndrome defense" and "did, in fact, raise a self-defense claim . . . somewhat similar to a Battered Woman Syndrome defense" by putting the victim's violence toward Petitioner before the jury.

The evidence does not preponderate against the post-conviction court's factual findings. Trial counsel elected instead to pursue self-defense, a theory that allowed him to present evidence of the victim's violence toward Petitioner without the attendant risks. This court likewise concludes that counsel's decision to forego a battered woman syndrome defense was strategic and reasonable.

The post-conviction court further found no prejudice, noting that the self-defense theory placed the victim's conduct before the jury and Petitioner offered no witnesses or proof to support a battered woman syndrome defense. The post-conviction court properly denied relief. Trial counsel articulated a reasonable strategic basis for declining to pursue a battered woman syndrome defense, and Petitioner's failure to present the evidence she now claims should have been offered forecloses any showing of prejudice. She is not entitled to relief.

### Failure to Litigate the Motions to Disqualify the Clerk's Office and the District Attorney General's Office

Petitioner argues trial counsel was ineffective when he withdrew the previously filed motions to disqualify the clerk's office and the district attorney's office. Petitioner argues that this decision was made "without conducting a single inquiry into the factual basis for the conflicts, without researching Tennessee's disqualification standards, without seeking an independent ethics review, and without even consulting [Petitioner]." The State contends Petitioner is not entitled to relief because she had failed to show that counsel was ineffective.

Tennessee law narrowly circumscribes the circumstances under which a district attorney general or an entire prosecutor's office may be disqualified, requiring proof of an actual conflict of interest, not merely an appearance of impropriety. An actual conflict arises when the prosecutor is involved in the same or similar dispute or there is a substantial risk that confidential information from the prior representation could materially advance the State's position. *State v. Tate*, 925 S.W.2d 548, 552-567 (Tenn. Crim. App. 1995). "Once an actual conflict of interest is shown, disqualification is the appropriate remedy." *Id.* at 553.

- 24 -

While there is well-developed and binding case law on when a district attorney general or the entire office may be disqualified, no authority exists for disqualifying a clerk's office based on alleged bias or conflict. Title 18 of the Tennessee Code governs clerks of court, detailing qualifications, duties, and grounds for removal, but it makes no provision for disqualification in judicial proceedings. Under Tennessee Code Annotated section 18-1-301, a clerk may be removed upon conviction of a misdemeanor or felony in office, for non-residence, failure to post security, mishandling public funds, incapacity, neglect of duty, misbehavior in office, or other legally specified causes—none of which include speculative bias.

Petitioner asserts that a disqualifying conflict existed based on her alleged long-standing and adversarial ties to both the clerk's office and the district attorney general's office. She claims that her more than fifteen years of employment in the clerk's office, followed by her termination by the current clerk, Barbara Williams – whom Petitioner claims she intended to challenge in the next election – created institutional hostility toward her. She further points to the fact that she was originally hired by Linda Effler, the aunt of the district attorney prosecuting her case. According to Petitioner, these overlapping professional, political, and familial relationships created a conflict significant enough to require disqualification of both the clerk's office and the district attorney general's office.

In evaluating trial counsel's decision to withdraw the motions to disqualify, the post-conviction court found no deficiency or prejudice:

> [T]he Court finds that there was some employment history involving the Petitioner and the current and former elected Circuit Court Clerks and also a family relationship between the current Circuit Court Clerk and witness Ms. Cook. However, the Court also finds that, according to [trial counsel], there was nothing in the record that the clerk did anything wrong in this case and that in his opinion, those motions were not well-supported by precedent and he was not likely to prevail on them. Although motions to disqualify both the clerk's and D.A.'s offices were filed by previous counsel, and in the opinions of the Petitioner's witnesses those motions should have been pursued, the Court finds that it was within the scope of competent practice for [trial counsel] to withdraw those motions after considering the lack of precedent to support them. The Court further finds that, even if it were error for [trial counsel] to withdraw the motions, there is no proof in this record that the Petitioner suffered any prejudice from either the clerk's office or the D.A.'s office based upon any of the relationship or personal history issues complained of in the withdrawn motions.

- 25 -

The proof supports the post-conviction court's findings. Trial counsel testified that the motions were withdrawn because no authority existed to support them. Indeed, Petitioner has not cited any legal authority to the contrary. Trial counsel explained that, in a small county where concerns about bias may arise, the proper and effective method for protecting a defendant's right to an impartial jury is through voir dire, not through a motion for disqualification. He pursued this method fully and exercised all available peremptory challenges, demonstrating that he actively used the correct legal mechanism to address any potential local bias. Trial counsel's exercise of every peremptory strike supports the reasonableness of this strategy.

Moreover, the record supports the post-conviction court's conclusion of no prejudice. Even assuming deficiency, Petitioner identifies no specific ruling, procedure, or action by the court clerk's office or the district attorney general's office that compromised the fairness of the proceedings. Because Petitioner has failed to demonstrate deficient performance and prejudice, she is not entitled to relief.

## II. Cumulative Error

Finally, Petitioner asserts that counsel's multiple deficiencies warranted relief under the cumulative error doctrine and undermined the adversarial process implicating a presumption of prejudice under *United States v. Cronic*, 466 U.S. 648, 657-58 (1984). The State responds that Petitioner waived both theories and, in any event, is not entitled to relief under either.

We need not consider the cumulative effect of any errors because the record reflects no cognizable individual error of ineffective assistance of counsel. To warrant relief under the cumulative error doctrine, there must have been more than one actual error committed during the trial proceedings. *State v. Herron*, 461 S.W.3d 890, 910 (Tenn. 2015) (citing *State v. Hester*, 324 S.W.3d 1, 77 (Tenn. 2010)). Without a single error, there is nothing to aggregate and the cumulative error review is unavailable.

Likewise, without a single error, there is no foundation for a presumption of prejudice under *Cronic*. *Cronic's* narrow exception applies when one of its narrowly defined circumstances is present such as a complete failure to test the prosecution's case. *Cronic*, 466 U.S. at 659. The record reflects no such circumstance. Having failed to show a single error or a total failure of advocacy, Petitioner is not entitled to relief.

**CONCLUSION**

We conclude that the record supports the post-conviction court's finding that Petitioner was not denied the effective assistance of counsel. For the foregoing reasons, the judgment of the post-conviction court is affirmed.

s/*Jill Bartee Ayers*
JILL BARTEE AYERS, JUDGE